**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

In re:

**KC FXE AVIATION INVESTMENTS,**          **Case No.: 22-19815-SMG**
**LLC, et al.,**                                          **(Jointly Administered)**

          **Debtors.**                                     **Chapter 11**

_____/

**THE CITY OF FORT LAUDERDALE'S MOTION TO DISMISS**
**CHAPTER 11 CASES FOR BAD FAITH PURSUANT TO 11 U.S.C. § 1112(b)(1)**
**OR, IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY**
**PURSUANT TO 11 U.S.C. § 362(d) OR, IN THE ALTERNATIVE,**
**FOR ABSTENTION PURSUANT TO 11 U.S.C. § 305(a)(1)**

The City of Fort Lauderdale (the "City"), through undersigned counsel, files its Motion to Dismiss Chapter 11 Cases for Bad Faith Pursuant to 11 U.S.C. § 1112(b)(1) or, in the Alternative, for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1) or, in the Alternative, for Abstention Pursuant to 11 U.S.C. § 350(a)(1) and states:

## I.      BACKGROUND

1.      The Debtor KC FXE Aviation Investments, LLC ("KC"), as lessee, entered into an Amended and Restated Lease Agreement with the City dated October 20, 2009 for Parcel 8AB at the Fort Lauderdale Executive Airport. The Amended and Restated Lease Agreement was amended multiple times thereafter and sets a final deadline of December 31, 2022 for KC to construct Phase III improvements on Parcel 8AB which consist of: one aircraft hangar with a minimum square footage of 22,340, office space, and an FBO terminal building with minimum square footage of 7,500. KC was also required to invest a minimum of $3,000,000.00 on these improvements by the deadline, or else the 8AB Lease "shall automatically terminate."[1]

---

[1]      Composite Exhibit "A" consists of: (1) the October 20, 2009 Amended and Restated Lease Agreement between the City and KC whose Exhibit "C" sets forth KC's improvement requirements with a deadline to complete the Phase III improvements of November 1, 2019 (120 months from the effective date of November 1, 2009 set forth in ¶ 4); (2) the June 19, 2012 First Amendment to Amended and Restated Lease Agreement which extends the deadline for KC to complete the Phase II improvements by 24 months; and (3) the August 16, 2016 Second

2.      The Debtor Terminal Ventures, LLC ("TV"), as lessee, entered into a Lease Agreement with the City on  February 24, 2020, which through various amendments thereafter, ultimately sets a deadline of December 31, 2021 for TV to complete Phase 2 improvements on Parcel 8G at the Fort Lauderdale Executive Airport consisting of "Interior Remodeling of the First Floor, exterior improvements consisting of landscaping, painting, and restriping of the parking lot" and TV was also required to provide proof that was satisfactory to the City that it expended a minimum of $625,000.00 on these improvements by January 31, 2022.  The 8G Lease provides that if TV failed to meet these deadlines, it is a "default" and the City may "immediately terminate the Lease Agreement by sending written notice thereof with sixty days' notice to cure ("Termination Date") to [TV] and the termination shall be effective on the Termination Date in the notice."  In accordance with the terms of the 8G Lease, TV was also required to complete Phase 3 improvements which include the Interior Remodeling of the Second Floor by July 31, 2022.  TV was also required to provide proof that was satisfactory to the City that it expended a minimum of $505,000.00 on the Phase 3 improvements by August 31, 2022.  The 8G Lease explicitly states that if TV fails to meet the aforementioned deadlines, the City could immediately terminate the 8G Lease.[2]

3.      KC and TV (collectively, the "Debtors") are each wholly owned by FXE FBO Holdings, LLC, which has not filed bankruptcy.[3]

## II.      THE 8AB LEASE

4.      While KC's December 26, 2022 bankruptcy filing stopped the 8AB Lease from "automatically terminat[ing]" on December 31, 2022 on its own terms for KC's failure to complete the Phase III improvements (subject to the provisions in Section 41 of the Amended and Restated

---

Amendment to Amended and Restated Lease Agreement which extends the Phase III improvements' deadline to the present (and last) deadline of December 31, 2022 (¶ 2(a)).  A subsequent amendment exists that suspends rent during COVID-19 that is not at issue and is not attached.  This will be referred to as the "8AB Lease."

[2]      Composite Exhibit "B" consists of: (1) the February 24, 2020 Lease Agreement between the City and TV which at paragraph 20(c) sets forth the pertinent improvements (including Phase 2 and Phase 3) along with its own Exhibit "B" which sets deadlines of December 31, 2020 for Phase 2 and July 31, 2021 for Phase 3; and (2) the April 20, 2021 Second Amendment to Lease Agreement which at paragraph 4 sets the deadlines for Phase 2 of December 31, 2021 and Phase III of July 31, 2022.  An intermediate First Amendment exists that simply suspends rent during COVID-19 that is not at issue and is not attached.  This will be referred to as "the 8G Lease."

[3]      ECF 8, ¶ 2

Lease Agreement which provide the leasehold mortgagee with certain contractual rights upon KC's default, addressed below, and which are not at issue),  KC contends that as of the bankruptcy filing, KC had completed two hangars of 20,000 square feet each, as well as 5,000 square feet of office space.[4]  KC nowhere contends that it completed the Phase III improvements required which consist of the construction of one aircraft hangar with a minimum square footage of 22,340, office space, and an FBO terminal building with minimum square footage of 7,500 and neither has KC asserted that it has provided proof to the City that it invested a minimum of $3,000,000.00 on the Phase III improvements by December 31, 2022.  As set forth more fully below with respect to TV's 8G Lease, KC blames its non-compliance on its attempt to sell its interest in the 8AB Lease to a third party (for a profit) which KC alleges were initiated in 2021.[5]  However, KC does not explain why it did not commence construction of the Phase III improvements prior to 2021 as it had over ten years to do so.

### III.    THE 8G LEASE

5.    With respect to the 8G Lease, on April 15, 2022, the City sent a Corrected Notice of Lease Default (the "Notice of Default and Termination") to TV notifying TV that TV had not completed the required Phase 2 improvements by December 31, 2021 and asked that such default be cured within 60 days, or else the 8G Lease "shall be deemed terminated effective June 14, 2022," which is the required 60 days from the date of the Notice of Default and Termination.[6]

### IV.    THE STATE COURT PROCEEDINGS CONCERNING THE 8G LEASE

6.    On July 5, 2022, the City filed an eviction action against TV in Broward County Court (Case No. COWE-22001830) setting forth TV's default under the 8G Lease for its failure to complete the Phase 2 improvements by December 31, 2021, and no cure having been completed by the 60-day cure period ending on June 14 2022, that TV was required to vacate immediately as the 8G Lease was terminated and TV accordingly had no right of possession.[7]

7.    On July 21, 2022, TV filed an answer, affirmative defenses, and counterclaims,[8] the gravamen of which is that in June of 2021, TV and KC sought to sell the interests in the 8G

---

[4]    ECF 21, ¶ 18
[5]    *Infra*, footnotes 9 and 10
[6]    Exhibit "C"
[7]    Exhibit "D"
[8]    Exhibit "E"

Lease, and in the 8AB Lease, to a third party REW Investments, Inc. d/b/a Fort Lauderdale Aviation Partners and operating as Million Air Fort Lauderdale ("Million Air").[9] TV claims TV had been led to believe through a course of dealing that the City would approve that sale and extend the imminent deadline of December 31, 2021 to complete the Phase 2 improvements on 8G, and the Phase III improvements on 8AB, so that the potential sale could be considered and approved.[10] TV contends such provides a defense under Florida law against any default, under *both* leases.[11] TV also seeks monetary damages in its counterclaims based on this same alleged conduct.[12] TV's counterclaims caused the dispute to be transferred to the Seventeenth Judicial Circuit Court Case No. CACE-22011787 (the "State Court Proceedings") because more than an eviction became at issue, with TV's damages exceeding the jurisdictional cap of Broward County Court.[13]

8.    TV's filings in the State Court Proceedings allege that in the *summer of 2022*, *after* the eviction litigation began, TV *began the process* of starting the Phase 2 improvements that in accordance with the terms of the 8G Lease, were required to be completed *on or before December 31, 2021*.[14]

---

[9]    *Id*. at pp. 2-3 (Second Affirmative Defense, Third Affirmative Defense, all of which also claim, along with the answer, that the City cannot enforce the default provisions of the 8G Lease that the 8G Lease is still valid, and claims the same with respect to the 8AB Lease with respect to that imminent default on its Phase III obligations).

[10]    *Id*.

[11]    *Id*. (the affirmative defenses raise that the same facts apply to the upcoming and unavoidable default of KC under the 8AB Lease such that the same facts should save both leases from being terminated)

[12]    *Id*. at pp. 7-19, Count I for Breach of Contract, Count II for Breach of Implied Covenant of Good Faith and Fair Dealing, and Count III for Inverse Condemnation, along with a demand for jury trial.

[13]    Exhibit "F" is the docket sheet for the Broward County Court eviction action reflecting the transfer to the Seventeenth Judicial Circuit Court on August 4 2022. Exhibit "G" is the docket sheet for the Seventeenth Judicial Circuit Court matter.

[14]    TV alleges in its counterclaims at Paragraph 25, Ex. E, that "upon receiving the [City's] Notice of Default [and Termination]," TV expanded over $350,000 to "direct its design professionals to complete construction plans and permit application requirements in advance of permit application," asked the City to provide it with approved interior and exterior drawings some of which were provided, "received signed and sealed construction plans from design professionals and engaged the services of a permit expediter," "hired a general contractor," told the City it was trying to cure the default, "worked with its general contractor to coordinate the initiation of Phase 2 Improvements," "commenced work" on *July 11, 2022* such as "plumbing, electrical and air conditioning," obtained the City's approval for one permit, and received another permit to start work, but acknowledges at the same time that the City refused monthly

9.      Immediately after the transfer of the dispute to the Seventeenth Judicial Circuit Court, on August 12, 2022, the City filed its Notice for Trial (Summary Procedure) to have its eviction matter heard on an expedited basis under Florida law.[15]  TV filed an objection on August 16, 2022 in which TV contends that the case is too complicated for a summary procedures trial,[16] to which the City filed a response on August 19, 2022 that the eviction action should be severed and tried summarily, with any damage claims by TV tried at a separate time after eviction.[17]  The matter was pending as of the bankruptcy filings.

10.      In the meantime, the City filed its answer and affirmative defenses to TV's counterclaim (which TV had amended to change an admission that the City was entitled to summary proceedings, to a denial).[18]  The City denied all material allegations, with the gravamen of the City's affirmative defenses being that the City had afforded TV many extensions of time to complete the required improvements under the 8G Lease, but those improvements were ultimately never completed due to an "absolute lack of progress" since the inception of the 8G Lease, which included "failing to apply for building permits until [TV] was notified of its default, and ultimately all TV wished to do was "flip the [8G] Lease" rather than construct what TV was contractually obligated to build.[19]

11.      On September 21, 2022, the City filed a motion for a case management conference which was scheduled for a hearing November 1, 2022.[20]  In response, on October 20, 2022, TV moved for summary judgment on the eviction action on the grounds that the City's Notice of Default and Termination was not properly noticed to TV's mortgagee,[21] to which the City responded on November 17, 2022.[22]  Also on November 17, 2022, the City filed its own motion for partial summary judgment.[23]

---

rental payment on the grounds that the 8G Lease was terminated, at Paragraph 28.

[15]      Exhibit "H"
[16]      Exhibit "I"
[17]      Exhibit "J"
[18]      Exhibit "K"
[19]      *Id*. at pp. 7-8 (Second Affirmative Defense)
[20]      Composite Exhibit "L" is the City's motion for a case management conference and the notice of hearing, which was ultimately continued to February 23, 2023, Exhibit "M."
[21]      Exhibit "N"
[22]      Exhibit "O"
[23]      Exhibit "P"

12.     During this summary judgment practice, TV served the City with comprehensive requests for production, requests for admission, and interrogatories, to which the City timely responded.[24]  Depositions were scheduled and noticed by both parties.[25]  TV filed its bankruptcy petition before any of the depositions were actually taken, or the summary judgments heard.[26]

## V.     THE DEBTORS' BANKRUPTCIES

13.     Instead of following through in the State Court Proceedings with respect to TV, and in order to stop KC's 8AB Lease from "automatically terminat[ing]" due to KC's failure to complete the Phase III improvements by December 31, 2022, the Debtors filed their chapter 11 bankruptcies on December 26, 2022, which have been consolidated.[27]  The Debtors admit that these bankruptcies were filed "for the assumption of the leases, completion of the projects, and restructuring of the Debtors' business operations."[28]  At the 341 meeting of creditors, however, the Debtors were unable to articulate why they initiated these chapter 11 proceedings, simply deferring to counsel to make a soliloquy on the record consisting of the same information as set forth in the case management summaries.[29]  The Debtors were unable to explain at the 341 meeting of creditors why they decided to file Chapter 11 cases instead of resolving the 8G Lease dispute in the pending State Court Proceeding, or to do the same with respect the 8AB Lease (where the same facts are alleged to provide the same defenses for KC's non-compliance).[30]

14.     Contrary to the case management summaries and counsel's soliloquy, however, the Debtors have no "business operations" for any "restructuring."  The Debtors have never had any revenue.[31]  The Debtors have no third-party general unsecured debt or any priority debt.[32]   KC has general unsecured *insider* debt.[33]   The Debtors have never had any

---

[24]     Exhibit "G"

[25]     *Id*.

[26]     *Id*.

[27]     ECF 1 in Case No. 22-19815; ECF 1 in Case No. 22-19816, with consolidation order at ECF 13

[28]     ECF 29, ¶ 5; ECF 30, ¶ 5

[29]     *Id*.; The 341 recording is being transcribed and will be filed upon receipt.

[30]     *Id*. (counsel raised attorney-client privilege to answering that question at all)

[31]     ECF 29, ¶ 7; ECF 30, ¶ 7

[32]     ECF 3 in KC bankruptcy; ECF 3 in TV bankruptcy (secured mortgage is only debt); ECF 29, ¶ 8(a); ECF 30, ¶ 8(a)

[33]     ECF 35, Schedule E/F, 3.1, 3.2, and 3.3, contact attorney is the same as the owner of the

employees.[34]  Prior to the bankruptcies, TV had never had a bank account.[35]  Prior to the bankruptcies, KC had a bank account which existed solely as a pass-through for its owners to make lease payments to the City, to pay City utilities, and to make monthly mortgage payments (addressed below).[36]  The Debtors have never conducted any business, have never had any operations, and have never had any financial problems.

15.    The Debtors mortgaged their leasehold interests to Dade County Federal Credit Union in the principal sum of $10,500,000, to which a non-filing affiliate of the Debtors is also a party, which non-filing affiliate operates a business from 8AB and/or 8G.[37]  In fact, while the Debtors' non-filing affiliate conducts business at the Debtors' premises, the Debtors' disclosed "business" is simply being parties to the 8AB Lease (KC) and the 8G Lease (TV).[38]  Dade County Federal Credit Union has rights under the 8AB Lease and the 8G Lease upon defaults of the Debtors,[39] but to date, that mortgage is not in default.

16.    The City contends that the 8G Lease with TV was terminated pursuant to the Notice of Default and Termination with an effective termination date of June 14, 2022, more than six months before the bankruptcies.[40]  TV's answer, affirmative defenses and counterclaims do not contest the terms of the 8G Lease or TV's failure to complete the Phase II improvements due on December 31, 2021 that resulted in the June 14, 2022 termination.[41] Rather, TV claims that the City cannot place the 8G Lease in default because the City acted wrongfully by not extending those deadlines upon request and otherwise misled the Debtors into thinking it would do so or would approve the proposed sale to Million Air.[42]  TV's filings are alleged to apply equally to the 8AB Lease, such that the City is estopped from placing either lease in default, or that the Debtors' readings of the leases preclude defaults under the

---

Debtors, FXE FBO Holdings, LLC, ECF 35, SOFA #28; 341 transcript, forthcoming

[34]    ECF 29, ¶ 11; ECF 30, ¶ 11

[35]    341 transcript, forthcoming

[36]    *Id*.

[37]    ECF 29, ¶ 3, 8(b); ECF 30, ¶ 3, 8(b)

[38]    ECF 29, ¶ 3; ECF 29, ¶ 3

[39]    Amended and Restated Lease Agreement in Ex. A, at ¶ 41 (KC); Lease Agreement, Composite Exhibit "B" at ¶39 (TV), providing that the Dade County Credit Union may select another lessee, subject to certain restrictions

[40]    Exhibit "C"

[41]    Exhibit "E"

[42]    *Id*.

facts.[43]  These matters were teed up for resolution in the State Court Proceeding before the Debtors decided for reasons they cannot explain to change course and initiate these chapter 11 cases in an obvious attempt at forum shopping and as a further delay tactic.

## VI.   RELIEF SOUGHT WITH SUMMARY OF ARGUMENT

17.     Neither KC nor TV has anything to reorganize in a chapter 11.  Neither has ever had any business, employees, revenues, or operations.  Rather, each is simply a party to a lease where neither timely performed non-monetary obligations for the construction of certain, and specific, improvements.  Apart from a mortgage on the leasehold interests with Dade County Federal Credit Union which is not in default, the Debtors have no debt except insiders loans.

18.     The Debtors blatantly failed to make the improvements for either parcel in a timely manner, after many extensions of time were provided to them by the City which amounted to *several years* of extensions.  Even with the extensions already provided to the Debtors, instead of choosing to comply with the terms of the leases, the Debtors tried instead to flip the leases for profit and to extend the improvement deadlines in both leases pending approval of that sale.  When that failed, the Debtors now accuse the City of breaching imaginary terms of the leases, or somehow acting inequitably such that the leases cannot be terminated until the Debtors *now* attempt to perform these obligations and complete them some time down the road.  Nothing in either lease requires the City to extend those improvement deadlines, or to approve any sale, and certainly not years after the fact.

19.     TV chose to actively and aggressively litigate the dispute with the City in the State Court Proceedings for approximately six months.  TV's litigation included filing counterclaims causing the matter to be moved from Broward County Court to the Seventeenth Judicial Circuit Court, filing a summary judgment motion, opposing the City's own summary judgment motion, serving comprehensive written discovery on the City and obtaining answers and responses from the City, and scheduling and noticing depositions of the City and its officials.  Meanwhile, TV took all actions necessary to stall the eviction trial, or even to have a case management order entered.  The City filed its own summary judgment motion, pressed for a severed summary procedures trial on the eviction (which TV opposed), and noticed its

---

[43]     *Supra*, footnote 11

own deposition of TV.

20.     Having multiplied all of that litigation, stalling the eviction, and the matter being teed up for dispositive summary judgment motions on the eviction, and TV having to actually provide facts and testimony to support all the pleading TV threw up to stall the eviction, the Debtors decided to change course and filed these chapter 11 proceedings. This is simply for more delays and to test the waters in another forum after their stall tactics expired in the State Court Proceedings. The Debtors are unable to provide any reason for doing so except to hide behind the attorney-client privilege, such that more delays and an attempt to find another forum can be the only reasonable inference for this Court to make. The Debtors knew they have no defenses to the City's termination of the 8G Lease more than six months before the bankruptcy, and had none to the imminent December 31, 2022 deadline for the 8AB Lease.

21.     TV does not contest its pre-petition default under the 8G Lease for TV's failure to complete—much less to start—the Phase 2 improvements timely, and the City's resulting termination of the 8G Lease based on such. KC similarly does not contend it had the ability to comply timely with the Phase III improvement deadlines in the 8AB Lease, the failure of which would have caused the 8AB Lease to "automatically terminate" but for the bankruptcy filing. Rather, the Debtors complain that their attempts to *potentially* sell their rights in the 8AB Lease and the 8G Lease, and to extend these improvement deadlines in the meantime, were never approved by the City. The Debtors claim such non-approval was wrongful and somehow merits court-ordered extensions (for years and counting) to complete improvements contrary to the terms of the 8AB and 8G leases themselves.

22.     If the Debtors truly believe the City's refusal to take action not required under the leases or related actions provide the Debtors with causes of action or defenses to defaults and evictions, then the Debtors can seek such relief in the State Court Proceeding. In fact, TV has already done so, and with a demand for a jury trial. KC is certainly free to do the same, as the facts are the same for KC, and are alleged as such by TV in that proceeding.

23.     This is not *only* a two-party dispute under Florida law that is already pending in the State Court Proceedings, this is no more than an attempt by the Debtors' owners to maintain these leases for *their own* economic benefit, not for the benefit of *any creditors*. The only non-insider creditor is Dade County Federal Credit Union, which has specific rights

under the leases upon any default by the Debtors.  The mortgage is not in default.

24.      What the Debtors are trying to do in this forum is not a proper use of chapter 11 and merits dismissal for bad faith under section 1112(b)(1), for stay relief under section 362(d)(1), and especially abstention under section 350(a)(1).

## VII.    ARGUMENT

### A.    These cases should be dismissed for cause under 11 U.S.C. § 1112(b)(1).

25.      The purpose of chapter 11 is to enable a financially distressed debtor to reorganize its financial affairs and develop a realistic plan of repayment.[44]  Chapter 11 is not intended to be used simply as a means of preventing  a creditor from enforcing its claims.[45]

26.      Section 1112 of Title 11 lays out a non-exclusive list of reasons for a court to dismiss a chapter 11 case, including for "cause" pursuant to 11  U.S.C.  §1112(b)(1) if it is determined that the petition was not filed in good faith.[46]  The Eleventh Circuit held in *In re State Street Houses* held that a bankruptcy court may consider the following factors established in *Phoenix Piccadilly:*

   a.      Whether the debtor has few unsecured creditors, whose claims are relatively small compared to the claims of the secured  creditors;

   b.      Whether the real property owned by the debtor is subject to a pending pre-petition foreclosure action;

   c.      Whether the debtor's financial problems are essentially a dispute between the debtor and its secured creditors which can be resolved in a pending state court action; and

---

[44]      *In re S. Cnty. Real., Inc.,* 69 B.R. 611, 615 (Bankr. N.D.Fla. 1987) ("The courts are increasingly expressing serious concern and view with a jaundiced eye Chapter 11 petitions by debtors with a single asset and with no meaningful body of creditors other than those who hold a mortgage on the single asset.") (citing *In re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir. 1984).  This case is the same except in the context of a single asset leasehold and the lessor seeking eviction.

[45]      *In re Am. Prop. Corp.,* 44 B.R. 180, 182 (Bankr. M.D. Fla 1984) ("Thus, debtors seeking protection of the Bankruptcy Court must have real debt, real creditors, and a legitimate purpose.")

[46]      *In re State St. Houses, Inc.,* 356 F.3d 1345, 1347 (11th Cir. 2004); *see also In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir. 1988); *In re Albany Partners, Ltd.,* 749 F.2d at 674; *In re Midway lnvs.,* 187 B.R. 382, 389 (Bankr. S.D.Fla. 1995); *In re Davis Heritage GP Holdings, LLC,* 443 B.R. 448, 455 (Bankr. N.D.Fla. 2011)

d.   Whether the timing of the debtor's bankruptcy filing evidences the intent to delay or frustrate enforcement of a secured creditor's rights.[47]

27.   Additional factors include:

a.   Whether there is a reasonable likelihood of reorganization;

b.   Whether there is sufficient income for the debtor to operate;

c.   Whether the pre-petition conduct of the debtor has been improper;

d.   Whether there was pressure from non-moving creditors at the time the petition was filed; and

e.   Whether the debtor filed chapter 11 to create the automatic stay.[48]

28.   A bankruptcy court may consider "any [other] factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions' or in particular, factors which evidence that the petition was filed to 'delay or frustrate the legitimate efforts of secured creditors to enforce their rights.'"[49] "The real test that still remains is the presence of honest intention of the debtor and some real need and real ability to effectuate the aim of a reorganization."[50]

29.   Here, all of the factors cut in favor of dismissal. Neither of the Debtors has any non-insider general unsecured creditors. While the Debtors do not own real property, their sole assets are the two leases, which is comparable to a single asset real estate bankruptcy. The 8G Lease is the subject of a pending eviction action in state court, which again is akin to a foreclosure action.[51] KC's bankruptcy filing five days before the 8AB Lease would "automatically terminate" prevented the City from filing an eviction action for 8AB. The present situation with respect to KC and TV is no different than a single asset real estate case with a pending foreclosures, with

---

[47]   356 F.3d at 1347

[48]   *In re SB Props., Inc.,* 185 B.R. 198, 204-05 (E.D. Pa. 1985)

[49]   *In re Phoenix Piccadilly*, 849 F.2d at 1394 (quoting *In re Albany Partners, Ltd.*, 749 F.2d at 674)

[50]   *In re Star Trust*, 237 B.R. 827, 834 n. 3 (Bankr. M.D. Fla. 1999) (citations omitted)

[51]   The City terminated the 8G Lease on June 14, 2022, which was prior to the commencement of this bankruptcy proceeding. Therefore, the 8G Lease is "expired" for purposes of 11 U.S.C. § 365 and cannot be assumed, the bankruptcy court lacking jurisdiction over the lease. *In re Coleman*, 291 B.R. 203, 204 (Bankr. M.D. Fla. 2003); *In re 163rd St. Med. Corp.,* 47 B.R. 869, 870-871 (Bankr. S.D. Fla. 1985), aff'd 67 B.R. 499 (S.D. Fla. 1986)..

no other creditors.  Such cases are routinely dismissed to be resolved in the state courts.

30.     The Debtors have no financial problems, are not financially distressed, and have no financial issues or business to reorganize.  Rather, this chapter 11 addresses the Debtors' failure to comply with the non-monetary terms of the two leases at issue, which was not related to lack of funds, but merely the fact that the Debtors did not intend to comply with the deadlines in the leases due to a years-long lack of attention or diligence.[52]  The 8G Lease is already the subject of state court litigation.  The 8AB Lease can easily be resolved in state court.  The timing of the Debtors' bankruptcy filings is evident: KC was five days from of its lease "automatically terminat[ing]" due to its failure to timely complete the Phase III improvements.  TV was on the eve of having to appear for case management conference, prepare for a trial, and to provide actual facts to support its attorney driven affirmative defenses and counterclaims to eviction both in discovery and at a trial.  This dodge is significant because as reflected at the 341 meeting, the Debtors are unable to articulate why they even filed these chapter 11 cases, except to affirm their counsel's soliloquy, or explain why they abandoned the State Court Proceedings, except to hide behind the attorney-client privilege.  That blatant evasion should not cut it at a 341 meeting, nor would it cut it in a deposition or an evidentiary hearing.  The Debtors' refusal (or inability) to answer why these chapter 11 cases were filed instead of resolving the matter in the State Court Proceedings where it was teed up for resolution should show the Court that the intent behind these filings favors dismissal.  Each *Phoenix Piccadilly* factor favors dismissal.

31.     As for the additional factors, no reasonable likelihood of any reorganization exists. The Debtors have no business operations or debt to reorganize.  The "reorganization" that appears on the table is to revive the leases by obtaining after-the-fact extensions for non-monetary defaults that occurred well prior to the bankruptcies.  The Debtors' proposed "reorganization" requires the Court to re-write the two leases and ignore Florida state law.  And this proposed "reorganization" is sought merely to preserve the value of the Debtors for *its owners, not to pay creditors*.  No chapter 11 plan of reorganization can be proposed in good faith, much less confirmed, on these

---

[52]     Exhibit "Q" is a February 24, 2022 letter from the Debtors to the City asking, almost two months after the Phase 2 improvement were due under the 8G Lease, for a 12-month extension for no other reason than the Debtors were still seeking a buyer.  As set forth in footnote 14, *supra*, the Phase 2 improvements due on December 31, 2021 had as of February 24, 2022 not even been started.

facts.

32.     The Debtors have certainly acted improperly prior to the bankruptcies.  The City afforded the Debtors with numerous extensions, covering many years, to complete the improvements at issue under both leases.  Despite such, neither of the Debtors complied with the deadlines in the leases.  As it pertains to 8AB Lease, after over thirteen years, KC has failed to even start constructing the Phase III improvements and has not even applied for a permit.  As it pertains to the 8G Lease, the Debtor still has not cured the default over a year after the deadline.  The 8G improvements were not even started until about seven months after the *completion* deadline, *three months* after a default notice, and *after* the City initiated an eviction.  The Debtors did not even attempt to comply before the December 31, 2021 deadline and the Debtors knew well before the December 31, 2021 deadline that they had no intention of complying with the deadlines in the 8G Lease, so they tried to flip the leases for profit.  When that failed, TV brought questionable defenses and counterclaims in the eviction action to further stall and frustrate the City's enforcement of its rights.  When on the brink of having to actually provide  factual support for TV's claims (which are the same as KC's), these bankruptcies followed.

33.     Last, the Debtors quite clearly filed these bankruptcies to create an automatic stay. KC needed to stop its lease from "automatically terminat[ing]" on December 31, 2022, just five days later.  The Debtors admitted such at the 341 meeting of creditors.  TV needed a stay to stop from having to actually provide facts to support its attorney-driven counterclaims and defenses to eviction when facing the City's attempts to obtain an eviction trial as soon as possible.

34.     In the case of *Singer Furniture Acquisition Corp. v. SSMC, Inc.*, the district court affirmed a dismissal under section 1112(b)(1) based on the fact that the debtor engaged in no business and has no employees (like this case), its reason for filing was a business dispute with one party that was already in active litigation with claims and counterclaims (like this case), and was filed on the eve of trial (this case, on the eve of a hearing to set an expedited trial and having to actually sit for a deposition).[53]  The *Singer Furniture* court noted, "[c]ourts have recognized factors which show an 'intent to abuse the judicial process and the purpose of the reorganization provisions' [when] the petition was filed strictly to

---

[53]     254 B.R. 46, 52-53 (M.D. Fla. 2000)

circumvent pending litigation . . . ."[54]  Indeed, whether evasion of the state court litigation is the sole or motivating factor cuts in favor of dismissal.[55]  Such is surely the case here.

35.     In sum, the court in *Singer Furniture* noted that when a debtor has nothing to reorganize (as in this case), no bank account (one Debtor had a bank account set up solely to pay three bills that was funded by an affiliate, not from any revenue), and no officer compensation (none here, with no business), the *Phoenix Piccadilly* factors are sufficiently met to merit dismissal.[56]  A dismissal is appropriate with only two assets, both of which are in foreclosure, no employees, no income, and no unsecured creditors.[57]  This case is just the same.

36.     In a similar case, *In re Lezdey*, a chapter 11 was dismissed when it was filed on the eve of a major hearing in another forum and the counterparty to that litigation was essentially the only general unsecured creditor.[58]  Again, those are the facts here.

37.     For these reasons, the City requests that the Court dismiss this chapter 11 case "for cause" with a prejudice period of no less than one year resulting from the Debtors' bad faith in filing the petition in this case pursuant to section 1112(b)(1).  These facts can reflect no other purpose than "to delay or frustrate the legitimate efforts" of the City to enforce the 8G Lease and evict TV, and to enforce the default of the 8AB Lease.[59]

**B.  The Court should provide the City with stay relief under 11 U.S.C. § 362(d)(1).**

38.     Pursuant to section 362(d)(1) of Title 11, the Court may grant relief from the automatic stay for "cause."  Where a debtor comes before a bankruptcy court in bad faith, such conduct may constitute "cause" for purposes of lifting the stay under section 362(d)(1).[60]  The

---

[54]     *Id*. at 52 (citing *Barclays-Am./Bus. Credit, Inc. v. Radio WBHP, Inc. (In re Dixie Broad., Inc.*), 871 F.2d 1023, 1026-27 (11th Cir.), *cert. denied*, 493 U.S. 853 (1989))

[55]     *Id*.

[56]     *Id*. at 52-53

[57]     *In re Canbec Inv. Corp.*, 349 B.R. 915, 918-19 (Bankr. M.D. Fla. 2006) ("[The Debtor's] financial problems are not more than a dispute between it and [the creditor] which can be resolved in the pending state court foreclosure proceeding.")

[58]     332 B.R. 217, 223 (Bankr. M.D. Fla. 2005) (schedules also reflect little to no income; dismissal based on what is essentially a two party dispute on the eve of a ruling in another forum)

[59]     *Phoenix Piccadilly*, 849 F.2d at 1395

[60]     *Disciplinary Bd. of Supreme Ct. v. Feingold (In re Feingold)*, 730 F.3d 1268, 1277 (11th Cir. 2013), *cert. denied*, 572 U.S. 1064 (2014)

factors considered by courts for granting stay relief for bad faith under section 362(d)(1) are identical to those for dismissal for bad faith under section 1112(b)(1).[61]

39.    The City incorporates the facts and argument set forth in Section VII(A) above to support a finding of "cause" so as to afford the City with relief from the stay.  Though they surely do here, where the facts may fall short of "cause" under section 1112(b), those same facts will merit relief from the stay.[62]  In one case, the stay was lifted based on the debtor having a single asset, no employees, so few other creditors besides the movant that the matter was essentially a two-party dispute, and the filing was made because other litigation strategies to stop the foreclosure action had failed.[63]  The same is true here.[64]

C.  **The Court should abstain from hearing this matter pursuant to Section 305(a)(1).**

40.    Section 305(a)(1) of Title 11 allows a court to dismiss a case if "the interests of creditors and the debtor would be better served by such dismissal . . . ."[65]  The "Eleventh Circuit has not directly addressed the issue of abstention under [section] 305,"[66] although, generally, courts consider several factors:

(a) whether another forum is available or there is already a pending action in another court;

(b) whether the creditor and debtor are actively engaged in an out of court workout;

(c) the purpose for which bankruptcy jurisdiction has been sought;

(d) whether the bankruptcy will unnecessarily interfere with state or federal regulatory schemes; and

(e) the effect the bankruptcy proceeding will have on the debtor's business.[67]

---

[61]    *In re Dixie Broad., Inc.*, 871 F.2d at 1026

[62]    *In re Arm Ventures, LLC*, 564 B.R. 77, 86 (Bankr. S.D. Fla. 2017)

[63]    *Id*. at 86 (only the presence of non-insider debt stopped dismissal)

[64]    With the 8G Lease's termination six months before the bankruptcy removing it from the bankruptcy court's jurisdiction, footnote 51, *supra*, stay relief is appropriate.  *See Harbour Bay Plaza Assoc. Ltd. v. Foxfire Inn of Stuart Fla. Inc. (In re Foxfire Inn of Stuart Fla. Inc.)*, 30 B.R. 30, 31-32 (Bankr. S.D. Fla. 1983).

[65]    11 U.S.C. § 305

[66]    *FMB Bancshares, Inc. v. Trapeza CDO XII, Ltd. (In re FMB Bancshares, Inc.)*, 517 B.R. 361, 371 (Bankr. M.D. Ga. 2014)

[67]    *Id.* at 371-72 (citing *In re Axl Indus., Inc.*, 127 B.R. 482, 485 (S.D. Fla. 1991))

41.     While the statute provides no express guidance regarding when "the interests of creditors and the debtor would be better served," other courts applying this statute have held that "reasoned judgment based on articulated facts is the only test which the statute itself requires."[68] Abstention is thus determined on a case-by-case basis, and a bankruptcy court is "not bound by a prescriptive template; it may consider any factors which it deems relevant to the determination of whether it is in the best interests of the parties" to dismiss a case.[69]  In making this statutory determination, courts consider various additional factors:

    (a) economy and efficiency of administration;

    (b) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in a state court;

    (c) whether federal proceedings are necessary to reach a just and equitable solution;

    (d) whether there is an alternative means of achieving the equitable distribution of assets;

    (e) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;

    (f) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and

    (g) the purpose for which bankruptcy jurisdiction has been sought.[70]

42.     Whether the "bankruptcy action is essentially a two-party dispute" is also considered, especially where the creditor can obtain non-bankruptcy relief.[71]  However, the factors mentioned "are merely factors for a court to consider and *no one factor standing alone*

---

[68]     *In re First Assured Warranty Corp.,* 383 B.R. 502, 529-30 (Bankr. D. Colo. 2008)
[69]     *Id*. at 529
[70]     *In re East 30A Rest. Assoc. LLC*, Case No. 17-30450, 2017 WL 4857418, at *3 (Bankr. N.D. Fla. Oct. 25, 2017) (citing *In re Fax Station, Inc.*, 118 B.R. 176, 177 (Bankr. D.R.I. 1990); *In re Birchall*, 381 B.R. 13, 18 (Bankr. D. Mass 2008); *In re Monitor Single Lift I, Ltd.,* 381 B.R. 455, 464–65 (Bankr. S.D.N.Y 2008)
[71]     *FMB Bancshares*, 517 B.R. at 372

represents a threshold issue that requires abstention."[72] Which factors to consider and how much weight shall be given to those factors is at the court's discretion.[73]

43.        Much like the inquiry for dismissal under section 1112(b) set forth above, each factor cuts in favor of abstention by this Court.  The Seventeenth Judicial Circuit Court was already overseeing the dispute with respect to TV, and that forum is certainly available for KC because KC's defenses to its non-performance, and all supporting facts, are all the same as is what is teed up in the TV matter.  Dispositive motions were filed by both sides on the eviction. TV had engaged in substantial written discovery.  Depositions had been scheduled and noticed by both sides.  The State Court Proceedings had been greatly complicated and multiplied *by TV*. That forum is where this matter can be more economically and efficiently handled.  Only state law is at issue.  A bankruptcy court is not necessary for the parties to resolve their disputes.  The dispute is whether TV may be evicted under the 8G lease and the validity of TV's defenses to the eviction , based on their own terms or equitable considerations.  KC has made the same state law-based arguments regarding its alleged rights under the 8AB lease. Determining the issue of the rights involving these two leases is not a bankruptcy court function if it is not tethered to any financial problems or a reorganization.  None exists here. The Debtors are using the bankruptcy court as a delay tactic and to roll the dice in another forum when prior strategy did not produce the desired result.   The Debtors want this Court to rule on what was pending in the State Court Proceedings so that the Debtors' owners can maintain the value of the Debtors.  This dispute does not involve any creditors, distribution, or reorganization.

44.        As for the additional factors, it is evident that the Debtors sought bankruptcy jurisdiction to stop the 8AB Lease from "automatically terminat[ing]" and to stall depositions and a trial in the TV dispute.  The Debtors admitted they filed these proceedings to stop that imminent default, but otherwise refused to state why, after multiplying the proceedings in the State Court Proceedings, they changed course to this forum.

45.        While this dispute should constitute simply the lease terms against non-performance, the Debtors, based on TV's filings in the State Court Proceedings, seek to

---

[72]        *Id.* (emphasis added)

[73]        *Id.*

(improperly) delve into how the City operates, approval processes, persons involved in decision-making, and other internal operations of the City.  To the extent the Debtors will try to make these matters an issue, that certainly interferes with local government regulatory schemes.  TV's filings in the State Court Litigation make much that the City's Aviation Advisory Board and other of the City's staff "approved" the amendments to the leases and the sale as urged by the Debtors, to support TV's claims, but ignore that advisory boards and staff have no authority to bind the City and their actions cannot provide causes of action.[74]  The presence of these issues favors abstention.

46.     As for the last factors, the Debtors have no business, so the bankruptcy proceeding will have no impact on any such business.  There is nothing to reorganize.  These chapter 11 cases are not anticipating any distribution of assets, the Debtors' owners simply want this Court to let them maintain their leases for their own benefit, and no one else's.

47.     In *In re C & C Development Group, LLC*, the court dismissed a case under section 305 because it was "evident" to the court that the creditor's motivation in filing the case was "to avoid the pending" state court action.[75]  The court further reasoned that dismissal was appropriate because the debtor had adequate state law remedies, and "dismissal will be granted where the [debtor is] attempting to use Bankruptcy Court as an alternative to proceeding with [s]tate [c]ourt litigation to resolve what is essentially a two-party dispute."[76]  That is precisely the case here.

48.     Another court abstained based on the existence of state court proceedings on the issue, as is the case here, explaining:

> [the Lawsuit in state court] has been on-going *for approximately seven months*.  The Lawsuit raises multiple causes of action which require the interpretation and application of state law.  The state court is in the best position to apply state law in applying state law in reaching a resolution, and thus, a federal proceeding is not necessary for a just and equitable outcome.  Because the state court is in a better position to resolve the Lawsuit, and because the claims in the Lawsuit must be resolved before this Chapter 11 case can take off, this Court would be unable to economically and efficiently administer the Debtor's estate.  Furthermore, resolution of the state court matters must occur before the Debtor can determine

---

[74]     Exhibit "E," counterclaims, ¶¶ 9, 11
[75]     No. 11-32362, 2012 WL 1865422, at *4 (Bankr. S.D. Fla. May 21, 2012)
[76]     *Id.* at *3

whether to assume or reject the lease, let alone propose a plan.[77]

49.     This is the same here.  TV's counterclaims arise solely in state law.  The Seventeenth Judicial Circuit Court is in the best position to resolve these state court issues, and in fact was in the process of doing so with pending discovery and cross motions for summary judgment concerning the eviction.  And the Debtors' confessed purpose in filing this matter, to try to assume the 8AB Lease and the 8G Lease, rather than accomplish any financial reorganization. It is clear the Debtors feared a loss in state court and turned to this Court with the hopes for another result and to further delay the inevitable.  This simply underscores that abstention is proper.

50.     Another court abstained based on the debtor being significantly down the road in other litigation, as here, which would have to be essentially re-started in the Chapter 11, which is what will happen here.[78]  That court also noted that while other creditors existed, those other creditors' claims "have no contentious issue" with the Debtor such that it does not turn the case into a multi-party dispute, it is a still a "two-party dispute."[79]  This precludes the Debtors from using the existence of Dade County Federal Credit Union to claim this is not a two-party dispute. There is no dispute with Dade County Federal Credit Union.   Its mortgage is not in default.  If it becomes contentious, the Seventeenth Judicial Circuit Court can easily hear it as well, as the mortgagee's rights are enumerated in the leases where Florida law controls, as has been noted as a factor in other courts.[80]

51.     Abstention is also warranted when a chapter 11 has been filed seeking relief that is available, or was available and rejected, by another forum.[81]  Again, all the Debtors are trying to do is save the 8AB Lease and the 8G Lease, which was already terminated (for their owners, not any creditors).  That relief is available in the state court, and in fact, that dispute is already teed up in that forum.

---

[77]     *In re East 30A Rest. Assoc. LLC*, 2017 WL 4857418, at \*3 (emphasis supplied)
[78]     *In re Forever Propane Sales & Serv., Inc.*, 597 B.R. 696, 699 (Bankr. S.D. Fla. 2019) (better to let existing litigation runs its course instead of starting back at zero)
[79]     *Id*.
[80]     *Id*.
[81]     *In re DocAssist, LLC*, Case No. 14-27625, 2014 WL 3955062, at \*2-3 (Bankr. S.D. Fla. Aug. 14, 2014)

52.     No factor favors the Court keeping these cases.  No reason exists why all the disputes between the City and the Debtors cannot be resolved where the dispute is already teed up and pending.  For these reasons, the Court should abstain from hearing this matter.

### VIII. <u>CONCLUSION WITH RELIEF REQUESTED</u>

53.     For the reasons set forth above, the City requests that this Court dismiss this case with prejudice for a period of no less than at least one (1) year for "cause" pursuant to section 1112(b)(1) resulting from the Debtors' bad faith in filing these cases.

54.     The City also requests that this Court afford it relief from the automatic stay for "cause" pursuant to section 362(d)(1) to pursue its eviction action, to evict both of the Debtors, and defend the counterclaims.

55.     Last, this Court should abstain from hearing this matter under section 305(a)(1).

56.     The City urges the Court to note that the City seeks this relief based on the nature of the dispute, that this dispute, whether factual or not, belongs in another forum.  That itself does not depend on this Court having to resolve any factual issues such that the City urges that the Court does not need to have an evidentiary hearing.  The City's filing relies upon the allegations of what is pending in the State Court Proceedings, the nature of that dispute, and the positions of the parties and the history of such.  None of that, applied to applicable law herein, requires the Court to make any findings of fact or to weigh evidence.  For this reason, the City urges the Court to decide the matter without any evidentiary hearing.  The Debtors' claim to the contrary simply reflects more attempts at delay.

WHEREFORE the City of Fort Lauderdale prays this Honorable Court will grant its Motion to Dismiss Chapter 11 Cases for Bad Faith Pursuant to 11 U.S.C. § 1112(b)(1) or, in the Alternative, for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1) or, in the Alternative, for Abstention Pursuant to 11 U.S.C. § 350(a)(1), and will enter its order accordingly.

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and I am in compliance with the additional qualifications to practice in this Court as set forth in Local Rule 2090-1(A).

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion has been served on all counsel of record in this case as listed on the CM/ECF systems with the Clerk of the Court for this case, this the 31st day of January, 2023.

**FENDER, BOLLING, AND PAIVA, P.A.**

 /s/ G. Steven Fender
G. STEVEN FENDER, ESQ.
Florida Bar No. 060992
Attorney for the City of Fort Lauderdale
P.O. Box 1545
Ft. Lauderdale, FL 33302
Telephone: (407) 810-2458
Email: steven.fender@fender-law.com